IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.   03-cv-01919-RPM

MARCA ANNE WILSON, decedent, by her next friend, next of kin, statutory heir and personal representative,
MICHAEL TIMOTHY WILSON,

        Plaintiff,

v.

TERRY MAKETA, in his official capacity as the Sheriff of El Paso County, Colorado
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF EL PASO, COLORADO, and
CORRECTIONAL HEALTHCARE MANAGEMENT, INC.,

        Defendants.
_____

ORDER GRANTING SUMMARY JUDGMENT
_____

In response to the defendants' motions for summary judgment of dismissal, the only claim the plaintiff has attempted to justify is the Fourth Claim for Relief claiming a violation of the plaintiff's liberty interest of intimate association with his wife, Marca Wilson, as protected by the Fourteenth Amendment to the United States Constitution. Marca Wilson died on February 18, 2003, as a result of hanging herself while she was a pre-trial detainee in the Criminal Justice Center ("CJC" or "Jail") in El Paso County, Colorado, on February 17, 2003.  The defendants are the Board of County Commissioners of El Paso County, the Sheriff of that County ("County") and Correctional Healthcare Management, Inc. ("CHM"), the contract provider of healthcare for prisoners in the Jail.

Mr. Wilson contends that "Defendants failed to prevent Marca Wilson from committing suicide despite a duty to do so." (Plaintiff's Response to Defendants' Motions for Summary Judgment, p.2). That is not a correct statement of the applicable law. Taken literally, it is the equivalent of imposing strict liability for a prisoner's suicide. The law is well established that a failure to provide medical treatment for serious medical needs, including mental health needs, constitutes cruel and inhuman punishment in violation of the Eighth Amendment, if the failure results from a deliberate indifference on the part of prison officials. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). For the plaintiff to recover on his personal claim for an infringement of his liberty interest in his marriage, he must prove that the defendants were deliberately indifferent to a known substantial risk that Marca Wilson would attempt suicide on February 17, 2003.

The plaintiff's claim that he sustained damages as a result of his wife's death is problematical, given that he filed for dissolution of their marriage and the decedent was served with process in that matter at the Jail on October 30, 2002, and they met with a case manager at the El Paso County Courthouse on February 11, 2003, resulting in the setting of a final orders hearing for June 18, 2003, to terminate the marriage.

The papers filed by the defendants in support of their motion show the following chronology of events which the plaintiff has not disputed.

1. Ms. Wilson was born on April 2, 1954, and was 48 years old at the time of her death.

2. She married Michael Wilson on February 17, 1999.

2

3. CHM began providing medical services to inmates at the CJC on March 1, 2002.

4. On October 14, 2002, Ms. Wilson was arrested by the Colorado Springs Police Department and charged with First Degree Arson.

5. Ms. Wilson was processed into the CJC on October 14, 2002.

6. As part of the intake procedure at CJC, Ms. Wilson received a medical health screen from Nurse Handlos during which Ms. Wilson indicated that she experienced anxiety and depression in the past. Ms. Wilson also stated that she had attempted suicide in the past, but repeatedly denied any current suicidal thoughts or mental health/emotional problems. The CHM computer file on Ms. Wilson indicated that she might be a suicide risk. Ms. Wilson stated she would not hurt herself. Nevertheless, Ms. Wilson was placed on a suicide watch until a mental health examination could be completed.

7. On October 22, 2002, Ms. Wilson was seen by Behavioral Assistant ("BA") Hutchinson for a mental health evaluation. Ms. Wilson reported that she had been going to counseling at the CJC to help her deal with being a victim of domestic violence. Ms. Wilson reported that she had no thoughts of suicide or self harm. Ms. Wilson presented with normal affect and normal speech rate/tone. She appeared logical and relaxed. She had positive eye contact, was humorous at times, was social, and did not appear anxious. Based on his evaluation, BA Hutchinson did not find Ms. Wilson to be a suicide risk.

8. On October 30, 2002, BA Siegal talked with Ms. Wilson because she was

crying after being served with the divorce papers. BA Siegal concluded that Ms. Wilson had no suicidal intent.

9. On November 8, 2002, Ms. Wilson again was seen by BA Siegal. Ms. Wilson reported experiencing anxiety and a racing heart as a result of being served with the divorce paperwork. Based upon her evaluation, BA Siegel determined that Ms. Wilson was logical, but depressed and anxious. BA Siegel also thought that Ms. Wilson had some unresolved issues related to the divorce and her history of emotional/physical abuse. BA Siegel did not identify Ms. Wilson as at risk for suicide. Ms. Wilson was scheduled to be seen by CHM's clinical psychiatrist.

10. On November 26, 2002, Ms. Wilson was examined by CHM's clinical psychiatrist, James Polo, M.D. Dr. Polo noted that Ms. Wilson was somewhat depressed and anxious, but he did not identify any signs or thoughts of suicide or self harm. Dr. Polo prescribed Prozac and Vistaril medication for Ms. Wilson and set a follow-up appointment for one month.

11. On December 16, 2002, Ms. Wilson was seen by Nurse Adzora who noted that Ms. Wilson was still experiencing some depression and anxiety. Ms. Wilson reported that she had been taking medication and was feeling better.

12. On December 30, 2002, Ms. Wilson was again seen by Dr. Polo. Ms. Wilson reported that she was feeling much better, was less depressed, and had decreased anxiety. Dr. Polo discontinued the Vistaril prescription and scheduled Ms. Wilson for an appointment in one month.

13. On December 31, 2002, Ms. Wilson engaged in loud outbursts and odd

behavior in her cell.  Ms. Wilson was placed in the administrative segregation unit and a mental health evaluation was requested by a deputy sheriff.  Ms. Wilson filled out a mental health request stating that she was experiencing on and off moments of paranoia and an urge to flee.  She specifically stated that she did not feel suicidal.

14.  On December 31, 2002, Ms. Wilson was seen by BA Hutchinson for evaluation.  Ms. Wilson told BA Hutchinson how she was feeling and what she was thinking.  BA Hutchinson noted that Ms. Wilson had normal affect and speech, was logical and tangential, and had positive eye contact and hygiene.  BA Hutchinson concluded that Ms. Wilson was "manic," but that some of her behavior may have been due to boredom in lock-down.  BA Hutchinson cleared Ms. Wilson to the day room and indicated that mental health would monitor Ms. Wilson to see if her behavior changed or if she remained manic.  Ms. Wilson was not determined to be suicidal.

15.  On January 1, 2003, Ms. Wilson was seen by mental health again because her behavior had not changed.  Ms. Wilson was placed back in lock-down because she needed "constant redirection."

16.  On January 4, 2003, Ms. Wilson was evaluated by Dr. Polo because of her recent behavior.  Dr. Polo reviewed her chart and what had taken place since he last saw her.  He noted her increased anxiety and put her back on Vistaril.  Dr. Polo did not find Ms. Wilson to be suicidal.

17.  On January 8, 2003, Ms. Wilson was seen by BA Siegel.  Ms. Wilson requested that she be allowed to remain in the administrative segregation unit for the duration of her incarceration.  Ms. Wilson discussed her legal issues, a possible 3 year

sentence, and stated she felt good about what might happen with her criminal case. Ms. Wilson denied any thoughts of suicide or self harm. Ms. Wilson presented as logical, alert, speech and rate normal with relaxed posture, good hygiene and bright affect. BA Siegal determined that Ms. Wilson should remain in the administrative segregation unit and would follow-up as needed.

18. When BA Siegel saw Ms. Wilson on January 17, 2003, she said she was feeling better and denied any suicidal or self harm ideation. Ms. Wilson reported that she was going to receive a competency evaluation as ordered by the court in her criminal case and felt good about the evaluation. Ms. Wilson reported increased stability with the Vistaril medication and had no further panic attacks. Based upon the evaluation, BA Siegel concluded that Ms. Wilson appeared to be doing better, that she was handling herself and others better, and that Vistaril had made a positive difference in her behavior.

19. On February 8, 2003, Ms. Wilson was seen by Dr. Polo who noted that Ms. Wilson was feeling increased anxiety, some loss of sleep and some panic. He noted that she was released from the administrative segregation unit on January 17, 2003. Dr. Polo did not note any indication of suicidal thought and placed Ms. Wilson on Elavil medication.

20. On February 11, 2003, Jonathan Olin, M.D. (A Forensic Psychiatrist) conducted the Court-ordered Competency Evaluation and issued his report on February 12, 2003. Dr. Olin reported that Ms. Wilson was not experiencing suicidal or homicidal ideation; there was no evidence of illogical thinking or flight of ideas. Dr. Olin

opined that Ms. Wilson's previously noted disorganization and illogical thinking in the jail, with expansive, religious, and sexual writings, may have been related to the stress of being arrested, and possibly there was an alcohol withdrawal component. However, Ms. Wilson appeared to have improved and was embarrassed by the reports of her disorganization. Dr. Olin opined that Ms. Wilson's previous level of disorganization had resolved in association with psychiatric treatment provided by CHM and possibly ongoing sobriety. Dr. Olin found that Ms. Wilson was not currently suffering from a mental disease or defect which rendered her incapable of understanding the nature and course of the proceedings against her, or of participating or assisting in her defense, or cooperating with her defense counsel.

     21. On February 15, 2002 [sic] Dr. Polo again examined Ms. Wilson. Dr. Polo noted that there was a decrease in Ms. Wilson's anxiety level and that she was in compliance with her medications. Dr. Polo did not find Ms. Wilson to be suicidal or harboring thoughts of self harm. Dr. Polo continued her medications of Prozac, Vistaril ane Evaril.

     22. On February 17, 2003, Ms. Wilson attempted suicide by hanging herself.

     23. On February 18, 2003, Ms. Wilson died of her injuries.

The defendants retained Paul Mattox, M.D., board certified in psychiatry and neurology, to review the medical records of CMH concerning the decedent and give his opinion for this case. In his report, dated October 7, 2005, Dr. Mattox gave this opinion:

> The care and treatment provided to Ms. Wilson during her incarceration was reasonable and appropriate, based on all of the

> circumstances presenting to the health, mental health and psychiatric staff at the time they were treating her. There is no support for an allegation of deliberate indifference to Ms. Wilson's physical and mental health needs. There is no support for an allegation that CHM's policies, procedures or practices caused or contributed to Ms. Wilson to suicide. She was appropriately and reasonably cared for. The care and treatment she received by Correctional Healthcare Management, Inc., staff and Dr. Polo, was not in any way the cause of her suicide attempt and ultimate demise. The fact that Ms. Wilson decided to end her life and was successful in doing so does not mean that the mental health care providers caring for her were negligent. The care and treatment rendered to her while she was a prisoner was in all respects reasonable and appropriate.

(Defendant CMH Exhibit D, p.5 of letter.)

The plaintiff has submitted nothing to contradict or challenge that opinion, relying only on treatises containing conclusions about the risk of suicide among patients receiving psychiatric or other mental health care. In essence, the views expressed show that a substantial percentage of patients commit suicide even though they are receiving care and treatment. Mr. Wilson has failed to identify what could have been done to prevent this death.

The plaintiff having failed to provide any evidentiary support for his claim under 42 U.S.C. § 1983, it is

ORDERED, that judgment shall entered dismissing this civil action and awarding the defendants their costs.

DATED: August 7th, 2005.

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge